ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL IV

| | | |
|---|---|---|
| **ENID NEGRÓN FUENTES**<br><br>Apelante<br><br>v.<br><br>**CHUBB INSURANCE COMPANY**<br><br>Apelado | KLAN202200679 | **APELACION** procedente del Tribunal de Primera Instancia, Sala de **San Juan**<br><br>Civil Núm.: **SJ2020CV04053**<br><br>Sobre: Incumplimiento de Contrato; Daños y Perjuicios |

Panel integrado por su presidenta, la Jueza Cintrón Cintrón, la Juez Barresi Ramos y la Jueza Rivera Pérez.

Cintrón Cintrón, Jueza Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 30 de enero de 2023.

Comparece ante nos la Sra. Enid Negrón Fuentes (señora Negrón Fuentes) y nos solicita que revisemos y revoquemos la *Sentencia* emitida y notificada el 13 de julio de 2022, por el Tribunal de Primera Instancia, Sala Superior de San Juan (TPI). Mediante la cual, declaró *Ha Lugar* la moción de sentencia sumaria presentada por Chubb Insurance Company of Puerto Rico (Chubb), y en consecuencia desestimó con perjuicio la demanda incoada por la señora Negrón Fuentes.

Al tenor con el marco fáctico-jurídico que expondremos a continuación, resolvemos confirmar el dictamen apelado.

**I.**

El 17 de febrero de 2021, la señora Negrón Fuentes entabló una demanda enmendada[1] en contra de Chubb sobre incumplimiento de contrato y daños y perjuicios. En su escrito,

---

[1] La demanda original fue incoada el 4 de agosto de 2020, por la señora Negrón Fuentes.

alegó que adquirió de dicha aseguradora dos (2) Certificados de Seguros de Vida e Incapacidad para los años 2001 y 2002, respectivamente.[2] Adujo que sufrió dos (2) caídas durante el año 2001, las cuales le provocaron daños incapacitantes. Expuso que solicitó en dos (2) ocasiones el pago de beneficios por incapacidad y que ambas solicitudes fueron denegadas por Chubb. Además, adujo que en enero de 2005 fue declarada incapacitada por la Administración de Seguro Social (ASS). Arguyó que la aseguradora en cuestión siempre requirió el pago de la prima de seguros. A su vez, argumentó que procedía la anulación de ambos certificados de seguros y la devolución con intereses de la prima cobrada. Solicitó al TPI que ordenara a Chubb a pagarle una suma no menor de $175,000.00 por la póliza *Income Protection Plan* (póliza IPP), $125,000.00 por la póliza *Futureshield* (póliza FS) y $100,000.00 en concepto de daños y perjuicios por angustias mentales.

Por su parte, el 1 de abril de 2021, Chubb presentó su contestación a la demanda enmendada y alegó que denegó la reclamación de la señora Negrón Fuentes porque el accidente ocurrió previo a la vigencia de la póliza FS. Con relación a la otra póliza que sí estaba vigente en ese momento, la IPP, arguyó que dicha solicitud fue sometida más de un (1) año de haber ocurrido la incapacidad, lo cual incumplía con los términos y condiciones de dicha cubierta que requería notificación del accidente dentro de los 20 días de su ocurrencia. También, adujo que la incapacidad no fue producto de una lesión corporal accidental, y que aplicaba la exclusión por enfermedad, según definida en la póliza FS, la cual proveía que "...no habrá cubierta con respecto a lesiones corporales causadas directa o indirectamente por estados patológicos,

---

[2] Las pólizas en cuestión son: 1) *Income Protection Plan* (IPP) emitida a favor de la señora Negrón Fuentes el 1 de diciembre de 2000 y 2) *Futureshield Plan* (FS), emitida a favor de la señora Negrón Fuentes el 1 de junio de 2002.

enfermedades o infecciones virales o bacterianas, aunque se hayan contraído por accidente".[3] Entre sus defensas afirmativas alegó que su responsabilidad estaba condicionada a las cláusulas, términos y condiciones de los contratos de seguro concernidos, que la reclamación estaba prescrita, que aplicaba la defensa de cosa juzgada, toda vez que la Oficina del Comisionado de Seguros de Puerto Rico (OCS) concluyó, luego de una investigación, que no incurrió en práctica desleal ni irracional al denegarle las reclamaciones a la señora Negrón Fuentes.

Más tarde, el 10 de mayo de 2022, Chubb instó *Moción Solicitando Sentencia Sumaria*.[4] Mediante la cual, alegó que la evidencia presentada en dicho escrito concluía que la lesión corporal accidental alegada no surgía exclusivamente de las caídas sufridas por la señora Negrón Fuentes en el 2001.[5] Además, argumentó que no procedía la alegación sobre enriquecimiento injusto, toda vez que la señora Negrón Fuentes podía cancelar su póliza en cualquier momento y esta nunca lo solicitó. Arguyó que para cancelar las pólizas a *motu proprio* tenían que cumplirse circunstancias que no

---

[3] Apéndice del recurso de apelación, Apéndice VI, a la pág. 21.
[4] Junto con esta moción, Chubb incluyó los siguientes anejos: i) Primer requerimiento de admisiones; ii) Deposición de Enid Negrón Fuentes; iii) Formulario de reclamación de accidente y salud; iv) Carta de la Oficina del Comisionado de Seguros dirigida a la señora Negrón Fuentes sobre la solicitud de investigación en torno a las actuaciones de ACE Insurance Company (ahora Chubb); v) Cuadro de Póliza *Income Protection Plan*; vi) Reporte de Accidente de Plaza del Sol; vii) Informe de Accidente de Plaza Las Américas; viii) Declaración de la señora Negrón Fuentes; ix) Certificado Médico; x) Recetario del Hospital Pavia; xi) Declaración Jurada del Dr. Rafael E. Seín Siaca; xii) Documentación de información médica sobre fibromyalgia; xiii) Primer Pliego de Interrogatorios y Requerimiento de Producción de Documentos; xiv) Certificación Médica de la Asociación de Médicos Generalistas de Corozal; xv) Cuadro de Póliza *Futureshield Plan*; xvi) Evaluación del Dr. Eldemiro Rodríguez a la señora Negrón Fuentes.
[5] La póliza *Income Protection Plan* (IPP) define el término lesión corporal accidental como:
　　"[...] lesión accidental que ocurra mientras esta Póliza está en vigor y que haya sido resultado sola, directa e independientemente de un accidente causado por medios externos, visible y violentos y que resulte en la Incapacidad Total del Afiliado Asegurado".
La póliza *Futureshield Plan* (FS) define el término lesión corporal accidental como:
　　"[...] lesión Accidental que ocurre durante la vigencia de esta Póliza y que es el resultado exclusivo y directo de un accidente causado por medios externos, violentos y visibles y que resulte en una pérdida cubierta por esta póliza".

　　Apéndice del recurso de apelación, Apéndice VII, a las págs. 332 y 342.

estaban presentes en este caso.[6] A su vez, adujo que tampoco procedían los daños y perjuicios en este pleito, toda vez que la aseguradora nunca incumplió con los contratos de seguros en cuestión. Alegó que la OCS determinó que la denegatoria de los beneficios provistos en dichas pólizas, a la señora Negrón Fuentes, fue debidamente fundamentada, conforme a las disposiciones de las cubiertas concernidas y no se desprendían actos constitutivos de posibles violaciones al Código de Seguros y su Reglamento. Solicitó al TPI que dictara sentencia sumaria a su favor y desestimara la demanda enmendada con perjuicio.

El 10 de junio de 2022, la señora Negrón Fuentes presentó su oposición a la moción de sentencia sumaria y, alegó que no se debía dictar sentencia sumaria a favor de Chubb porque se debían considerar varios criterios para analizar los contratos de seguros, objeto de este litigio. Argumentó que se debía tomar en cuenta la intención de las partes al contratar las primas pactadas, las circunstancias concurrentes con la negociación y contratación y las prácticas y costumbres establecidas en este tipo de industria.

Evaluadas ambas posturas, el 13 de julio de 2022, el TPI emitió el dictamen que hoy revisamos. Mediante este, el foro primario resolvió que la doctrina de enriquecimiento injusto no aplicaba a la controversia de autos, toda vez que las pólizas concernidas constituían un pacto válido y legal entre las partes que obligaba a la señora Negrón Fuentes a cumplir con los pagos

---

[6] En cuanto a la póliza IPP, Chubb enumeró las circunstancias siguientes: 1) la cancelación de la cuenta de la tarjeta American Express del asegurado; 2) la fecha de aniversario siguiente a la llegada del asegurado a la edad de 65 años; 3) si el asegurado cesa de realizar los deberes propios de la ocupación que aparece en el Formulario de Aceptación, excepto cuando sea debido a razones de Lesión Corporal Accidental; 4) el fallecimiento del asegurado; y 5) si el asegurado se encuentra Total y Permanente Incapacitado y Chubb ha pagado la suma final de esta póliza. *Íd.*, a la pág. 72.

Con relación a la póliza FS, Chubb enumeró las circunstancias siguientes: 1) la cancelación de la cuenta de la tarjeta American Express del asegurado; 2) la muerte del asegurado; y 3) la fecha del aniversario de la póliza de cualquier persona asegurada después de haber cumplido los 75 años de edad. *Íd.*, a la pág.73.

estipulados. También, el foro *a quo* determinó que la póliza FS no estaba en vigor al momento de los accidentes de la señora Negrón Fuentes, que dicho seguro cobró vigencia cinco (5) meses y 12 días después de la última caída. Además, especificó que la lesión corporal no resultó en la incapacidad de la señora Negrón Fuentes dentro del periodo de 180 días desde la fecha del accidente, sino que fue certificada por lo menos tres (3) años después. Así, el foro primario desestimó la causa de acción amparada en la póliza FS.

Igualmente, el TPI determinó, en cuanto a la póliza IPP, la cual establecía que en el caso de que ocurriere un accidente durante la vigencia de dicha póliza, la lesión tendría que ser un resultado directo del accidente, para que el asegurado pudiera recibir los beneficios. El foro primario resolvió que la fibromialgia de la señora Negrón Fuentes estaba relacionada a un accidente vehicular ocurrido en 1998, por lo que concluyó que la lesión que provocó la incapacidad de esta se suscitó previo al periodo de vigencia de la póliza IPP.

Así las cosas, el TPI resolvió que:

[...] Chubb Insurance no incurrió en incumplimiento de contrato al negarse a conceder los beneficios contemplados en las pólizas. Lo anterior, puesto que surge meridianamente de sus términos que la concesión de los beneficios está sujeta a que la lesión incapacitante ocurra durante su vigencia. Chubb Insurance ha presentado documentos tendentes a demostrar que los accidentes que causaron la lesión incapacitante en este caso anteceden la vigencia de las pólizas. A su vez, Negrón Fuentes ha tenido amplia oportunidad de descubrir prueba para establecer la relación necesaria entre sus caídas y la lesión incapacitante, aun así, descansó en sus afirmaciones.[7]

Inconforme con esta determinación, la señora Negrón Fuentes instó una moción de reconsideración sin éxito. Aún insatisfecha, el 23 de agosto de 2022 presentó un recurso de apelación ante este Tribunal e imputó al TPI, los siguientes señalamientos de error:

---

[7] *Íd*, Apéndice X, a la pág. 376.

Primer error: Erró el Tribunal de Primera Instancia al declarar ha lugar la sentencia sumaria presentada por Chubb cuando existen controversias de hechos materiales y pertinentes.

Segundo error: Erró el Tribunal de Primera Instancia al declarar ha lugar la sentencia sumaria privando a la demandante de su día en corte sin haberse interpretado el contrato de seguro globalmente a base del conjunto de sus términos y condiciones.

Tercer error: Erró el TPI al declarar sumariamente, sin fundamento para ello, que una "lesión corporal" reclamada no contribuyó a la incapacidad de la demandante, cuando ésta fue incapacitada por A.S.S. por condiciones médicas que no fueron descartadas y/o evaluadas por el perito de la aseguradora.

Cuarto error: Erró el TPI al determinar sumariamente que la fecha de certificación de incapacidad por la A.S.S. no es la fecha desde la cual se calcula el término de (180) días para solicitar beneficios de incapacidad a la aseguradora.

Quinto error: Erró el TPI al determinar sumariamente en cuanto a los términos y condiciones de la póliza sin ofrecer oportunidad a la demandante de su día en corte para auscultarse la intención de la contratación y su derecho a confiar en la cubierta descrita en la póliza.

El 12 de octubre de 2022, Chubb presentó su alegato en oposición a la apelación solicitada. Con el beneficio de la comparecencia de ambas partes, procedemos a resolver.

**II.**

**A.**

La Regla 36 de Procedimiento Civil dispone el mecanismo extraordinario y discrecional de la sentencia sumaria. 32 LPRA, Ap. V, R. 36. El propósito principal de este mecanismo procesal es propiciar la solución justa, rápida y económica de litigios civiles que no presentan controversias genuinas de hechos materiales, por lo que puede prescindirse del juicio plenario. *González Santiago v. Baxter Healthcare*, 202 DPR 281, 290 (2019); *Meléndez González v. M. Cuebas*, 193 DPR 100, 109 (2015); *S.L.G. Zapata Rivera v. J.F. Montalvo*, 189 DPR 414, 430 (2013); *Ramos Pérez v. Univisión*, 178 DPR 200, 213-214 (2010). Los tribunales pueden dictar sentencia sumaria respecto a una parte de una reclamación o sobre la totalidad de esta. 32 LPRA Ap. V, R. 36.1; *Meléndez González v. M. Cuebas*, supra. La sentencia sumaria procederá si las alegaciones,

deposiciones, contestaciones a interrogatorios y admisiones ofrecidas, junto a cualquier declaración jurada que se presente, si alguna, demuestran que no hay controversia real y sustancial sobre algún hecho esencial y pertinente y que, como cuestión de derecho, procede hacerlo.

El promovente debe presentar una moción fundamentada en declaraciones juradas o en cualquier evidencia que demuestre la inexistencia de una controversia sustancial de hechos esenciales y pertinentes sobre la totalidad o parte de la reclamación. 32 LPRA Ap. V, R. 36.1. La controversia sobre los hechos esenciales que genera el litigio tiene que ser real, no especulativa o abstracta. Es decir, tiene que ser de naturaleza tal que permita concluir que existe una controversia real y sustancial sobre hechos relevantes y pertinentes. *Ramos Pérez v. Univisión*, supra, págs. 213-214, seguido en *Meléndez González v. M. Cuebas*, supra, pág. 110.

Por su parte, le corresponde a la parte promovida refutar dicha moción a través de declaraciones juradas u otra documentación que apoye su posición. Esto es, la parte que se opone debe proveer evidencia sustancial de los hechos materiales que están en disputa. El hecho de no oponerse a la solicitud de sentencia sumaria no implica necesariamente que ésta proceda si existe una controversia legítima sobre un hecho material. Sin embargo, el demandante no puede descansar en las aseveraciones generales de su demanda, "sino que, a tenor con la Regla 36.5, estará obligada a 'demostrar que [tiene] prueba para sustanciar sus alegaciones'". La Regla 36.5 de Procedimiento Civil, 32 LPRA Ap. V, R. 36.5, dispone que de no producirse por parte del opositor una exposición de hechos materiales bajo juramento, deberá dictarse sentencia sumaria en su contra. *Ramos Pérez v. Univisión*, supra, págs. 215-216. (Citas omitidas.)

La Regla 36.4 de Procedimiento Civil, 32 LPRA Ap. V, R.36.4, establece que, si no se dicta sentencia sobre la totalidad del pleito, ni se concede todo el remedio solicitado o se deniega la moción de sentencia sumaria, y por tanto, es necesario celebrar juicio, será obligatorio que el Tribunal en su dictamen determine los hechos esenciales sobre los cuales no haya controversia sustancial y aquellos que sí se encuentran genuinamente en controversia.

Cónsono con lo anterior, nuestro estado de derecho le impone y exige al TPI, exponer los hechos materiales y esenciales que están en controversia, así como los que no lo están, independientemente de cómo resuelvan una solicitud de sentencia sumaria. *Meléndez González v. M. Cuebas*, supra, pág. 117. Al evaluar la solicitud de sentencia sumaria, el juzgador deberá: (1) analizar los documentos que acompañan la moción solicitando la sentencia sumaria, los incluidos con la moción en oposición y aquellos que obren en el expediente judicial y; (2) determinar si el oponente controvirtió algún hecho material o si hay alegaciones de la demanda que no han sido controvertidas o refutadas en forma alguna por los documentos. *PFZ Props., Inc. v. Gen. Acc. Ins. Co.*, 136 DPR 881, 913-914 (1994).

Por último, en *Meléndez González v. M. Cuebas,* supra, el Tribunal Supremo estableció el estándar de revisión que debe utilizar este foro apelativo intermedio al revisar denegatorias o concesiones de mociones de sentencia sumaria. Conforme a ello, debemos utilizar los mismos criterios que los tribunales de primera instancia al determinar si procede dictar sumariamente una sentencia. En esta tarea sólo podemos considerar los documentos que se presentaron ante el foro de primera instancia y determinar si existe o no alguna controversia genuina de hechos pertinentes y esenciales, y si el derecho se aplicó de forma correcta. La tarea de adjudicar los hechos relevantes y esenciales en disputa le

corresponde únicamente al foro de primera instancia en el ejercicio de su sana discreción. *Vera v. Dr. Bravo*, 161 DPR 308, 334 (2004). Finalmente, debemos revisar *de novo* si el Tribunal de Primera Instancia aplicó correctamente el derecho a la controversia. *Meléndez González v. M. Cuebas*, supra, pág. 119.

**B.**

La industria de seguros está revestida del más alto interés público. Por ello, es regulada ampliamente por el Estado. *Jiménez López et al. v. SIMED,* 180 DPR 1, 8 (2010); *Carpets & Rugs v. Tropical Reps*, 175 DPR 615, 632 (2009). Ello debido al papel que juega en la protección de los riesgos que amenazan la vida o el patrimonio de los ciudadanos. *Feliciano Aguayo v. MAPFRE*, 207 DPR 138, 149 (2021); *Rivera Matos v. Estado Libre Asociado de Puerto Rico*, 204 DPR 1010,1019 (2020). Uno de los renglones mayormente reglamentado por el Código de Seguros de Puerto Rico es el perteneciente a las prácticas desleales y fraudes en el negocio de los seguros. Como parte de las prácticas desleales detalladas allí, se encuentran aquellas relacionadas al ajuste de reclamaciones. *Carpets & Rugs v. Tropical Reps*, supra, a la pág. 632. Véanse, además, Arts. 27.010–27.270 del Código de Seguros de Puerto Rico, 26 LPRA. secs. 2701–2736.

El Código de Seguros de Puerto Rico regula, entre otros aspectos de la industria y de la entidad reguladora, el contrato de seguros. En específico, este cuerpo de normas define seguro como "el contrato mediante el cual una persona se obliga a indemnizar a otra o a pagarle o a proveerle un beneficio específico o determinable al producirse un suceso incierto previsto en el mismo". *Feliciano Aguayo v. MAPFRE*, supra, a la pág. 148; Art. 1.020 del Código de Seguros de Puerto Rico, 26 LPRA sec. 102. Los contratos de seguro tienen como característica esencial la obligación de indemnizar y son de extrema buena fe. *OCS v. CODEPOLA*, 202 DPR 842, 859

(2019). Esto es, que se requiere un extremo grado de buena fe en las negociaciones precedentes a la perfección o consumación del contrato.

Así, ante la ocurrencia del evento incierto previsto en el contrato, el asegurado debe presentar su reclamación y la aseguradora está obligada a resolverla. En particular, el Art. 27.162 del Código de Seguros de Puerto Rico establece que la aseguradora debe realizar la investigación, el ajuste y la resolución de la reclamación en el periodo razonablemente más corto dentro de los noventa días después del reclamo. 26 LPRA sec. 2716b; *Feliciano Aguayo v. MAPFRE*, supra, a las págs. 151-152. Cuando la aseguradora cumple con su obligación de enviar una oferta razonable al asegurado, esta constituye meramente el estimado de los daños sufridos. Al emitir dicho documento, el asegurador está informando que después de una investigación diligente, un análisis de los hechos que dieron lugar a la pérdida, un examen de la póliza y sus exclusiones, y un estudio realizado por el ajustador de reclamaciones del asegurador, se concluye que la póliza cubre ciertos daños reclamados por el asegurado, en las cantidades incluidas en la comunicación. Después de todo, al analizar una reclamación, los aseguradores tienen una obligación de llevar a cabo un ajuste rápido, justo, equitativo y de buena fe. *Carpets & Rugs v. Tropical Reps*, supra, a la pág. 635. El documento que emite el asegurador producto de una investigación y análisis detenido constituye puramente la postura institucional del asegurador frente a la reclamación de su asegurado; es decir, un reconocimiento de deuda al menos en cuanto a las sumas ofrecidas como ajuste, pero no una oferta producto de una controversia *bona fide* o la iliquidez de la deuda, en este caso, de la reclamación del asegurado. *Feliciano Aguayo v. MAPFRE*, supra, a las págs. 164-165. Es por esto que a un asegurador no se le permite retractarse del ajuste que como

obligación envía a su asegurado, salvo fraude de parte del reclamante u otras circunstancias extraordinarias que al asegurador le era imposible descubrir a pesar de una investigación diligente. *Carpets & Rugs v. Tropical Reps,* supra, a la pág. 635.

En el caso de autos, están involucradas dos (2) pólizas emitidas a favor de la señora Negrón Fuentes en los años 2001 y 2002 de parte de ACE Insurance Company (ahora Chubb), las cuales son: *Income Protection Plan* (IPP) y *Futureshield* (FS). En cuanto a la póliza IPP, esta describe sus beneficios como:

> Si mientras esta Póliza está en vigor, el Afiliado Asegurado se encuentra imposibilitado de desempeñar los deberes propios de su oficio o profesión por Incapacidad Total Temporal Accidental o imposibilitado para desempeñar cualquier otro oficio o profesión y recibir remuneración por Incapacidad Total y Permanente Accidental ambas **a causa de una Lesión Corporal Accidental que se haya producido mientras esta póliza se encuentra en vigor**, la compañía pagará el Beneficio Mensual que aparece en el cuadro de Póliza, cuando dicha Incapacidad Temporal y/o Total y Permanente Accidental continúa durante el Período de Beneficio que comienza después del Período de espera de noventa (90) días.[8] (Énfasis nuestro).

De otra parte, la póliza FS describe sus beneficios como:

> Si la persona Asegurada sufre una lesión Corporal Accidental **durante el periodo de tiempo en que esta póliza esta en vigor**, y la cual independientemente de cualquier otra causa y <u>dentro de ciento ochenta (180) días</u> de la fecha del accidente **resulta en la muerte o incapacidad de dicha persona**, la compañía pagara los siguientes beneficios… (Énfasis nuestro).

[…][9]

**III.**

Por su estrecha relación, procedemos a discutir todos los errores señalados conjuntamente.

---

[8] *Íd.*, Apéndice VII, a la pág. 332. Recordemos, además, la definición que le da esta póliza a la "lesión corporal accidental" que es cuando la lesión ocurra mientras esta cubierta está en vigor **y haya sido el resultado sola, directa e independientemente de un accidente causado por medios externos, visible y violentos** que resulte en la incapacidad total del asegurado. (Énfasis Nuestro) *Íd.*
[9] *Íd.*, a la pág. 342. Recordemos, además, la definición que le da esta póliza a la "lesión corporal accidental" que es cuando ocurre **durante la vigencia de esta póliza** y que es el resultado <u>exclusivo y directo</u> de un accidente causado por medios externos, violentos y visibles y que resulte en una pérdida cubierta por esta póliza. (Énfasis nuestro) *Íd.*

En esencia, la apelante alega que existen hechos materiales en controversia y que el TPI erró al declarar *Ha Lugar* la sentencia sumaria presentada por Chubb. En cuanto a esto, aduce que la fibromialgia no fue el único diagnóstico considerado por la Administración del Seguro Social (ASS) en su determinación de incapacidad. Argumenta que hay controversia en cuanto a si el término provisto para la pérdida de capacidad, a consecuencia de un accidente sufrido por el asegurado, es decir los 180 días, comienzan a contar luego de la determinación de incapacidad por parte de la ASS.

De igual modo, aduce que los funcionarios de la aseguradora la orientaron para que esperara la determinación de la ASS para solicitar los beneficios de las pólizas. Además, arguye que presentó su solicitud 112 días desde que se emitió la determinación de incapacidad por la ASS. Expone que el foro primario erró al dictar sentencia sumaria, sin análisis y discusión de los contratos de las pólizas, los cuales no establecían claramente las condiciones médicas que estaban excluidas. A su vez, alega que erró el TPI al determinar sumariamente que la fecha de certificación de incapacidad por la ASS no es la fecha desde la cual se calcula el término para solicitar los beneficios, toda vez que los contratos de seguro en cuestión, particularmente la póliza FS, establece que ninguna reclamación por pérdida incurrida o incapacidad que comienza tres (3) años desde la fecha de expedición de la póliza se reducirá o se negará por el fundamento de que, con anterioridad a la fecha de efectividad de la cubierta, existía una enfermedad o lesión física no excluida de la cubierta por su nombre o descripción específica. Por último, argumenta que erró el *foro a quo* al determinar sumariamente sin auscultar la intención de la contratación y su derecho a confiar en la cubierta descrita en las pólizas.

Por su parte, Chubb alega que la señora Negrón Fuentes solicitó los beneficios de las pólizas IPP y FS por la condición de fibromialgia post traumática. A su vez, argumenta que la determinación de incapacidad de la ASS no es prueba fehaciente porque ninguna de las pólizas requiere que la pérdida de capacidad deba ser certificada por dicha oficina federal. Además, aduce que la determinación de cubierta está sujeta a los términos pactados. Arguye que los requisitos de la ASS no aplican porque las pólizas de incapacidad no son beneficios adicionales de dicho programa federal.

En cuanto al término de 180 días para la pérdida de capacidad a raíz de un accidente sufrido por el asegurado, Chubb expone que la señora Negrón Fuentes le reportó que su último día de trabajo fue el 2 de julio de 2004, por recomendación de sus médicos que concluyeron que la ansiedad del trabajo le empeoraba la fibromialgia. Chubb alega que pasaron más de 180 días desde las caídas en el 2001 a julio de 2004. A su vez, argumenta que la póliza FS no aplica porque la lesión corporal accidental ocurrió previo a la vigencia de dicha cubierta y que en cuanto a la póliza IPP, la lesión que causó la fibromialgia sobrevino previo a la fecha de vigencia de dicha póliza. También, aduce que el Dr. Rafael E. Seín Siaca (doctor Seín Siaca) concluyó en su evaluación que el único trauma que puede ser la causa de la condición cervical de la señora Negrón Fuentes es el accidente de automóvil en el 1998, en el cual se reportó un trauma en el cuello.

En la presente causa, el récord revela que la solicitud de la señora Negrón Fuentes para reclamar los beneficios de las pólizas IPP y FS de Chubb, fue a raíz de las caídas que esta sufrió durante el año 2001. Según los términos y condiciones de la póliza FS, es necesario que el accidente ocurra durante la vigencia de dicha cubierta. En este caso, la efectividad de la póliza FS comenzó a partir

de 1 de junio de 2002. Además, la incapacidad de la señora Negrón Fuentes fue certificada alrededor de 2005, tres (3) años después y no dentro de los 180 días del accidente como lo establece la póliza FS.

Aunque al momento de las caídas, sí se encontraba en vigor la póliza IPP, particularmente desde 1 de diciembre de 2000, resulta evidente que los términos y condiciones de la referida cubierta establecen no solo que el accidente ocurra dentro de la vigencia de la misma, sino que requiere que la lesión haya sido el resultado directo del accidente. Del expediente surge que Chubb contrató al doctor Seín Siaca para que evaluara la prueba médica presentada por la señora Negrón Fuentes, y este concluyó que "[e]l único trauma que puede ser la causa de la condición cervical que reporta la Sra. Enid Negrón es un accidente de automóvil que sostuvo el 12 de septiembre de 1998, según surge del expediente de su médico primario...".[10] A su vez, determinó que las otras condiciones enlistadas por la ASS no estaban relacionadas con las caídas sufridas en el 2001. Ante esta prueba, la señora Negrón Fuentes se limitó a alegar en su oposición a la moción de sentencia sumaria, que Chubb dejó de exponer como hecho probado que la fibromialgia no era consecuencia directa de las caídas sufridas por esta, sin incluir en su oposición a la sentencia sumaria, ningún tipo de prueba documental que controvirtiera, de conformidad con la Regla 36 de Procedimiento Civil, *supra*, ese hecho propuesto por Chubb, el cual fue fundamentado con prueba documental y pericial.

Tras un ponderado examen del expediente ante nos y del derecho aplicable discutido, forzoso es colegir que procedía declarar *Ha Lugar* la sentencia sumaria presentada por Chubb. Por lo tanto, procede confirmar la determinación sumaria apelada.

---

[10] *Íd.*, a la pág. 273.

**IV.**

Por los fundamentos antes expuestos, confirmamos la sentencia sumaria apelada.

Lo acordó y manda el Tribunal y lo certifica la Secretaria.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones